NORTHERN AIR SERVICES, INC., Link Snacks Global,
Inc. and Link Holdings, Inc.,
Plaintiffs-Respondents,

Troy J. LINK, Link Snacks, Inc., L.S.I., Inc. -
New Glarus and L.S.I., Inc.,
Plaintiffs-Respondents-Cross-Appellants,

John E. LINK,
Plaintiff-Respondent-Cross-Appellant-Petitioner,

v.

Jay E. LINK,
Defendant-Third-Party
Plaintiff-Appellant-Cross-Respondent-Petitioner,

v.

John A. HERMEIER, Lawrence J. Jarvela,
Michael McDonald, Richard May, Link Buildings,
Inc. and Jack Link Cattle Company, Inc.,
Third-Party Defendants-Respondents.

Supreme Court

*No. 2008AP2897. Oral argument October 6, 2010.
—Decided July 14, 2011.*

1

2011 WI 75

(Also reported in 804 N.W.2d 458.)

For the defendant-third-party-plaintiff-appellant-cross-respondent-petitioner oral argument by *Michael J. Aprahamian, Foley & Lardner LLP*, Milwaukee, with whom on the briefs were *Michael S. Heffernan, Michael A. Bowen,* and *Brian E. Cothroll,* Milwaukee and *Thomas O. Mulligan,* Spooner.

For plaintiff-respondent-cross-appellant-petitioner oral argument by *Brian P. Norton, Freeborn and Peters,* Chicago. There were briefs by *Michael D. Freeborn, Brian P. Norton, Michael P. Kornak,* and *Andrew C. Nordahl,* Chicago, and *Webster A. Hart, Stephanie L. Finn, Herrick & Hart, S.C.* Eau Claire.

¶ 1. MICHAEL J. GABLEMAN, J. This case is a complex civil action that initially involved fourteen different parties in eighteen separate, but related, claims and counterclaims. The controversy centers on a bitter interfamilial dispute among John Link (Jack)

and his two sons, Jay Link (Jay) and Troy Link (Troy). The Link family owns various companies that produce and distribute meat and cheese snacks.

¶ 2. In August 2005, after a number of conflicts between Jack and Jay, Jay's employment ended at Link Snacks, Inc. (Link Snacks). In September 2005, Jack and Troy filed suit seeking specific performance of a Buy-Sell Agreement that would require Jay to surrender his shares in Link Snacks. Jay filed counterclaims alleging that Jack and Troy had breached fiduciary duties owed to Jay as a minority shareholder by "squeezing" Jay out of Link Snacks in a scheme to buy Jay's shares at a discounted price.

¶ 3. After two years of discovery, the Washburn County Circuit Court, Eugene D. Harrington, Judge, presiding, conducted a trial in three phases, which included a six-week jury trial. The jury found that Jack and Troy breached fiduciary duties owed to Jay, and that Jay breached fiduciary duties owed to Link Snacks. During the third phase of the trial, after the jury's verdicts, the circuit court granted specific enforcement of the Buy-Sell Agreement and concluded that Jay, as a matter of law, had not been oppressed under Wis. Stat. § 180.1430(2)(b) (2005–06).[1]

¶ 4. Jay appealed three issues to the court of appeals. First, he argued that the circuit court erred in its conclusion that Jay had not been oppressed by Jack and Troy. Second, he argued that the circuit court erred in limiting the evidence he could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. Third, he argued that the circuit court erred in remitting the punitive

_____

[1] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

damages awarded against Jack for breaching fiduciary duties owed to Jay.

¶ 5. Jack cross-appealed the jury's verdict awarding punitive damages to Jay. Link Snacks also moved to dismiss Jay's appeals related to: (1) Jay's contention that the evidence at trial established oppression as a matter of law; and (2) Jay's argument that the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.

¶ 6. This is a review of a judgment and an order of the court of appeals.[2] The judgment of the court of appeals granted Jack and the remaining respondents and cross-appellants partial dismissal of Jay's appeal. The order of the court of appeals, which was issued separately, reversed the circuit court order remitting a punitive damages award against Jack, reasoning that Jack's postverdict motion requesting the remittitur was untimely filed under Wis. Stat. § 805.16.

¶ 7. Three issues are before this court:

¶ 8. First, Jack argues that the court of appeals erred in reinstating the $5,000,000 punitive damages award against him. The court of appeals reinstated the punitive damages award because Jack's postverdict motion requesting the remittitur was untimely filed under Wis. Stat. § 805.16. Jack argues that: (1) the circuit court properly considered his postverdict motion under *State v. Treadway,* 2002 WI App 195, 257 Wis. 2d 467, 651 N.W.2d 334; or, (2) alternatively, if the circuit court did err in its reliance on *Treadway,* the bright-line rule articulated in *St. John's Home of Milwaukee v. Continental Casualty Co.,* 150 Wis. 2d 37, 441 N.W.2d

_____

[2] *N. Air Servs., Inc. v. Link,* No.2008AP2897, unpublished slip op. (Wis. Ct. App., Nov. 17, 2009).

219 (1989), should be extended to limit the discretion of the clerk of circuit court in accepting pleadings received after usual business hours.

¶ 9. Second, Jay argues that the court of appeals erred in concluding that, under the benefit-estoppel doctrine,[3] he waived his right to appeal the judicial dissolution claim under Wis. Stat. § 180.1430(2)(b).

¶ 10. Third, Jay argues that the court of appeals erred in concluding that, under the benefit-estoppel doctrine, he waived his right to appeal whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. He submits that the benefit-estoppel doctrine is inapplicable to the instant case because, among other things, his appeal of the circuit court's decision to limit the evidence he could present regarding his fiduciary duty damages theory relating to his breach of fiduciary duty claims against Jack and Troy is independent of the circuit court's order enforcing the Buy-Sell Agreement.

¶ 11. We hold the following:[4]

---

[3] In *Wyandotte Chemicals Corp. v. Royal Electric Manufacturing Co.,* 66 Wis. 2d 577, 592–93, 225 N.W.2d 648 (1975), this court articulated the general rule applicable to the waiver of a party's appeal when accepting the benefits of the judgment appealed. Jay refers to this general rule as the "benefit-estoppel doctrine." We use this term for the purposes of this opinion.

[4] On the first issue, the court unanimously concurs in the mandate that the circuit court improperly considered Jack's untimely postverdict motion. However, for future cases, Chief Justice Shirley S. Abrahamson, Justice Ann Walsh Bradley, Justice N. Patrick Crooks, and Justice Annette Kingsland Ziegler overrule *Granado v. Sentry Insurance,* 228 Wis. 2d 794,

(1) The circuit court erred in remitting the award of punitive damages against Jack. The circuit court's reliance on *Treadway* in considering Jack's tardy postverdict motion was misplaced. *Treadway* does not apply to multi-phase civil actions, such as the instant case. Further, we would decline to extend the bright-line rule of *St. John's Home* in order to limit the discretion of the clerk of circuit court in accepting pleadings received after usual business hours. Accordingly, we affirm the court of appeals in its conclusion the circuit court improperly considered Jack's postverdict motion.

599 N.W.2d 62 (Ct. App. 1999), and will then apply the bright-line rule in *St. John's Home of Milwaukee v. Continental Casualty Co.*, 150 Wis. 2d 37, 441 N.W.2d 219 (1989), to clerks of circuit court. Accordingly, the majority of this court holds that *Granado* is overruled, and the bright-line rule in *St. John's Home* prospectively applies to clerks of circuit court.

On the second issue, the court unanimously concurs in the mandate that Jay no longer has standing to maintain a claim for judicial dissolution.

On the third issue, the court unanimously concurs in the mandate that Jay did not, under the benefit-estoppel doctrine, waive his right to appeal the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. The court remands this case to the court of appeals for a determination of whether the circuit court erred by limiting the evidence Jay could present to the jury regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. Justice Annette Kingsland Ziegler, joined by Justice N. Patrick Crooks, concurs in that remand; Justice Ziegler writes separately, however, to point out that regardless of how it decides the evidentiary issue, the court of appeals may need to consider whether this case should be remanded to the circuit court for a new trial on the issue of damages because of the circuit court's failure to abide by the statutory requirements in Wis. Stat. § 805.15(6).

(2) The court of appeals properly rejected Jay's oppression claim under Wis. Stat. § 180.1430(2)(b). We do not address, however, whether Jay waived his right to bring his oppression claim under the benefit-estoppel doctrine because we conclude he does not have standing to appeal his oppression claim under § 180.1430(2)(b). The statutory language of § 180.1430(2)(b) clearly states that a party must be a "shareholder" in order to seek judicial dissolution of a corporation. Jay lost his status as a shareholder in Link Snacks when he surrendered his shares under the Buy-Sell Agreement. Therefore, we affirm the court of appeals on this issue, but on different grounds.

(3) Jay did not, under the benefit-estoppel doctrine, waive his right to appeal the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. The contractual obligations set forth in the Buy-Sell Agreement, which were enforced by the circuit court, would not be affected if Jay, on appeal, were successful in arguing that the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. Consequently, the benefit-estoppel doctrine is inapplicable to Jay's appeal of the circuit court's decision to limit the evidence Jay could present regarding his fiduciary duty damages theory relating to his breach of fiduciary duty claims against Jack and Troy. We therefore reverse and remand to the court of appeals to decide whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.

## I. BACKGROUND

¶ 12. In the mid-1980s, Jack began selling meat snacks in Minong, Wisconsin. The business steadily expanded, and in 1995, Link Snacks, Inc.,[5] became entirely family-owned when Jack's sons, Jay and Troy, acquired shares of the company.

¶ 13. As a condition precedent to their ownership of the company shares, the three Links agreed to enter into a Buy-Sell Agreement. Among other things, the Buy-Sell Agreement granted the company "the option to redeem all or a portion" of Jack, Troy, or Jay's shares if their employment with Link Snacks was terminated, with or without cause. As set forth in the Buy-Sell Agreement, the purchase price for such shares would be the "fair market value"[6] determined by an appraiser mutually agreed upon by the parties.

¶ 14. Jack, Jay and Troy managed to co-exist in a state of grudging comity until around 2002. At this

---

[5] Link Snacks, Inc., is a non-statutory closely held corporation headquartered in Minong, Wisconsin. Generally, a "closely held corporation" refers to a corporation that has a small number of stockholders, no ready market for the corporate stock, and substantial majority stockholder participation in the management of the corporation. *See* Baruch Gitlin, *When is Corporation Close, or Closely-Held, Corporation Under Common or Statutory Law,* 111 A.L.R.5th 207 (2003). The Link family has ownership stakes in several corporations, including Northern Air Services, Inc., Link Snacks Global, Inc., Link Holdings, Inc., Link Snacks, Inc., L.S.I., Inc.–New Glarus, L.S.I., Inc., Jack Link Cattle Company, Inc., and Link Buildings, Inc. For the purposes of this opinion, however, "Link Snacks" refers solely to Link Snacks, Inc.

[6] "Fair market value" per share refers to a share's value after downward adjustments are made to its "fair value" to account for lack of control (in the case of shares representing a minority interest) and lack of ready marketability. *See HMO-W, Inc. v. SSM Health Care Sys.,* 2000 WI 46, ¶ 39, 234 Wis. 2d

point, the somewhat-amicable relations between Jack and Jay began to fray, and conflicts between the two arose with increasing frequency. Jack and Jay had serious disagreements about how to run the company. Their disagreements and mutual animosity eventually culminated in a 2005 Departure Memorandum executed by Link Snacks and Jay. In the Departure Memorandum, the parties agreed that Jay would be terminated as an employee and officer of Link Snacks and Link affiliates and the parties would attempt to negotiate an amicable buy-out of all Jay's interests in the various Link-related companies.[7]

¶ 15. After executing the Departure Memorandum, there was a period of unsuccessful negotiation regarding the documents necessary to close the purchase of Jay's shares.[8]

## II. PROCEDURAL HISTORY

¶ 16. On September 23, 2005, Link Snacks, Jack, Troy, and several other plaintiffs[9] filed a complaint

707, 611 N.W.2d 250. This is opposed to "fair value" per share, which is the net worth of a closely held corporation, divided by the number of shares. *Id.*

[7] Jay had ownership stakes in several Link-related companies, a number of which have been involved in the present litigation over the past several years. Link Snacks, Inc., however, is the only Link-related company directly relevant to the issues before this court.

[8] The facts relevant to the court's analysis in the instant case are fairly simple. Nonetheless, the parties devote a significant portion of their briefs giving lengthy accounts of the inflammatory acts each of the parties has committed against the other. While these accounts certainly illuminate the sincerity with which the parties dislike each other, they do not aid our analysis, and will not be set forth herein.

[9] The plaintiffs in the September 23, 2005 complaint included Link Snacks, Jack, Troy, L.S.I.-New Glarus, L.S.I.-South

11

against Jay seeking, inter alia, specific performance of the Buy-Sell Agreement and money damages for breach of fiduciary duties by Jay.

¶ 17. On November 7, 2005, Jay filed his answer and counterclaims.[10] Jay alleged, inter alia, that Jack and Troy breached fiduciary duties owed to Jay, and contended that the actions taken by Jack and Troy to remove him as an officer and shareholder in the Link Snacks companies were tortious.[11] Jay also claimed that he was oppressed[12] by Jack's and Troy's tortious actions. As a remedy he sought to either dissolve the Link Snacks companies through a shareholder auction pursuant to Wis. Stat. § 180.1430(2)(b) or, in lieu of dissolution, recover the "fair value"—as opposed to "fair market value"—of his shares.[13]

---

Dakota, Link Global, and Northern Air Services. Several claims were alleged against Jay, but only the claim seeking specific performance of Link Snacks' Buy-Sell Agreement and the breach of fiduciary duty claim are directly applicable on this appeal.

[10] Jay amended this pleading on August 11, 2006.

[11] Jay alleged several counterclaims against Link Snacks, Jack, Troy, L.S.I.-New Glarus, L.S.I., Link Global, Northern Air Services, John Hermeier, Larry Jarvela, Michael McDonald and Richard May, but only the judicial dissolution claim against Link Snacks and the breach of fiduciary duty claims against Jack and Troy have been raised on appeal.

[12] Under Wis. Stat. § 180.1430(2)(b), shareholders may seek judicial dissolution of a corporation when those in control of the corporation have acted in an "illegal, oppressive, or fraudulent" manner.

[13] In the instant case, the parties stipulated to the submission of evidence establishing that, as of July 31, 2005, the fair value of Jay's shares in Link Snacks was $31,800,000, and the fair market value was $19,400,000. July 31, 2005 was the last day of the month preceding Jay's departure from Link Snacks,

¶ 18. In order to recover the fair value of his shares, Jay sought to recover the difference between the fair value of his shares and the discounted fair market value price at which Link Snacks was permitted to redeem his shares under the Buy-Sell Agreement. He claimed that the difference between the two prices represented ill-gotten gain associated with Jack's and Troy's wrongful actions.

¶ 19. After the September 23, 2005 complaint and Jay's counterclaims were filed, the parties engaged in discovery for nearly two years. In late 2007, the parties filed cross-motions for summary judgment on several claims. On February 15, 2008, the circuit court granted summary judgment in favor of Link Snacks on their claim for specific performance of the Buy-Sell Agreement, but only to the extent the circuit court concluded it was a valid, enforceable, and unambiguous agreement. The circuit court left for trial Jay's defense and counterclaim that enforcement of the Buy-Sell Agreement would be oppressive.

## A. Circuit Court

¶ 20. The case proceeded to trial in May 2008. Due to the complexity of the issues presented, the circuit court ordered the case to proceed in three consecutive phases. The first phase of the trifurcated trial ("Phase I") involved equitable claims not relevant to this appeal.

¶ 21. For the second phase of the trifurcated trial ("Phase II"), the court empanelled a jury to resolve the legal claims that the parties had asserted against one another for money damages. This phase lasted six weeks.

and was the date specified in the Buy-Sell Agreement to appraise the value of the departing shareholder's shares.

¶ 22. On July 9, 2008, the jury returned its verdicts. The jury made several findings. Specifically relevant to this appeal, the jury concluded that Jack breached fiduciary duties to Jay, and awarded Jay $736,000 in compensatory damages[14] and $5,000,000 in punitive damages to be paid to Jay by Jack. The jury also concluded that Jay breached his fiduciary duties to Link Snacks and L.S.I., Inc., (L.S.I.) both before and after he departed from the companies, and awarded $1 in compensatory damages to each company, along with punitive damages of $3,500,000 and $1,500,000 to Link Snacks and L.S.I., respectively.

¶ 23. After the jury returned its verdicts on July 9, 2008, the circuit court specifically advised the parties that any postverdict motions would be due on July 29, 2008, pursuant to Wis. Stat. § 805.16.[15] Both Jack and Jay filed postverdict motions, each requesting a reduction in the punitive damages that had been awarded against them.

---

[14] The award of $736,000 in actual damages was not a number argued by either party, but approximately equals one year of Jay's salary.

[15] Wisconsin Stat. § 805.16(1) states: "Motions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by an order specifying the dates for filing motions, briefs or other documents."

At a later proceeding, Jack's counsel suggested confusion existed as to whether the 20–day statutory deadline of Wis. Stat. § 805.16 applied to his postverdict motions. The circuit court took umbrage at this suggestion, noting that it specifically reminded counsel that the 20–day statutory deadline applied: "I did that for a reason, because I knew before, I knew when I said it, and I know it now, that motions after verdict have to be filed within that period of time."

¶ 24. On July 29, 2008, Jay filed his postverdict motions with the Washburn County Clerk of Circuit Court at 4:32 pm, two minutes after the close of usual business hours. Despite the fact that the filing occurred two minutes after the close of usual business hours, the clerk of circuit court accepted and stamped the postverdict motions as being filed on July 29, 2008.

¶ 25. Also, on July 29, 2008, Jack mailed his postverdict motion from Chicago to the Washburn County Clerk of Circuit Court. The clerk of court received and filed the postverdict motion on July 30, 2008, one day after the statutory deadline imposed by Wis. Stat. § 805.16. Consequently, the circuit court, *sua sponte,* accepted Jay's postverdict motions but initially rejected Jack's postverdict motion as untimely.

¶ 26. The circuit court later reversed its rejection of Jack's postverdict motion, and, relying on *State v. Treadway,* 257 Wis. 2d 467, decided to consider the merits of Jack's postverdict motion. The circuit court was persuaded by both Jay's and Jack's postverdict motions and granted each of their motions seeking a reduction in punitive damages.[16] This reduction brought the punitive damages and compensatory damages awarded to both Jay and Jack to a one to one ratio. As a result of the circuit court's reduction, Jay was ordered to pay $1 in compensatory damages and $1 in punitive damages to Link Snacks and $1 in compensatory damages and $1 in punitive damages to L.S.I., and Jack was ordered to pay Jay compensatory damages in the

---

[16] The circuit court concluded that the punitive damages assessed against both Jay and Jack were unconstitutionally excessive.

15

amount of $736,000 and punitive damages in the amount of $736,000.[17]

¶ 27. During the third phase of the trifurcated trial ("Phase III"), the circuit court turned to the equitable claims for specific performance and judicial dissolution, the resolution of which involved the facts adduced during Phase II. The circuit court concluded that, as a matter of law, Jay was not oppressed under Wis. Stat. § 180.1430(2)(b). As a result, the circuit court denied Jay's claims for judicial dissolution of Link Snacks and L.S.I.-New Glarus under § 180.1430(2)(b) and granted Link Snacks' motion to compel specific performance of the Buy-Sell Agreement. By granting Link Snacks' motion to compel specific performance of the Buy-Sell Agreement, the circuit court ordered Jay to surrender his shares in Link Snacks for $19,400,000 —the appraised fair market value of his shares as set forth in the Buy-Sell Agreement.

## B. Court of Appeals

¶ 28. On appeal, Jay contended the evidence at trial established oppression as a matter of law. In lieu of dissolution, however, he requested money damages as an equitable remedy, because he no longer owned

[17] The jury awarded Jay $5,000,000 in punitive damages upon finding that Jack acted maliciously toward Jay. Additionally, the jury awarded $5,000,000 in punitive damages to Link Snacks and L.S.I. upon finding that Jay acted maliciously toward each company—$3,500,000 to be paid to Link Snacks and $1,500,000 to be paid to L.S.I. After the circuit court reduced the punitive damages awards, the amount Jay was to receive from Jack as punitive damages was reduced from $5,000,000 to $736,000, and, correspondingly, the amount Link Snacks and L.S.I. were to receive from Jay was reduced from $3,500,000 and $1,500,000, respectively, to $1 each.

shares in Link Snacks. Further, Jay requested a remand to the circuit court on the issue of damages, arguing that the circuit court erred in precluding Jay from presenting evidence to the jury on his theory of damages relating to his breach of fiduciary duty damages against Jack and Troy. Jay also appealed the circuit court's order reducing his $5,000,000 punitive damages award against Jack.

¶ 29. Link Snacks cross-appealed the portion of the judgment awarding punitive damages to Jay. Link Snacks also moved to dismiss Jay's appeals related to: (1) Jay's contention that the evidence at trial established oppression as a matter of law; and (2) Jay's argument that the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.

¶ 30. In an unpublished decision, the court of appeals affirmed the circuit court's decision to reduce the amount of punitive damages awarded to Link Snacks and L.S.I., reversed the circuit court's conclusion that *State v. Treadway* permitted Jack's postverdict motion to be timely, and reversed the circuit court's order remitting the punitive damages awarded to Jay. The court of appeals disagreed that *State v. Treadway* applies to multi-phase civil cases, concluding that the *Treadway* court "explicitly relied on a distinction between civil and criminal cases." *N. Air Servs., Inc. v. Link,* No.2008AP2897, ¶ 8, unpublished slip op. (Wis. Ct. App., Nov. 17, 2009). Consequently, the court of appeals concluded the circuit court's decision to consider the merits of Jack's postverdict motion was improper. After reversing the circuit court's decision to consider Jack's postverdict motion, the court of appeals

17

reinstated that part of the jury's original verdict which required Jack to pay $5,000,000 in punitive damages to Jay.[18]

¶ 31. In a separate order, the court of appeals concluded that Jay voluntarily waived his right to appeal the question of whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy, as well as the oppression claim against Link Snacks, because he complied with the circuit court's order that he surrender his shares in Link Snacks. Relying on *Wyandotte Chemicals Corp. v. Royal Electric Manufacturing Co.*, 66 Wis. 2d 577, 225 N.W.2d 648 (1975), the court of appeals concluded that, under the benefit-estoppel doctrine, Jay waived his right to appeal all portions of the judgment except those awarding reduced punitive damages. Thus, the court of appeals dismissed Jay's appeal from most of the portions of the judgment and other orders adverse to him.

¶ 32. Jack and Jay separately petitioned this court for review, which we granted.

### III. STANDARD OF REVIEW

¶ 33. The issues before this court all present questions of law that we review de novo.

¶ 34. The court is asked to clarify the application of Wis. Stat. § 805.16 in civil trials with multiple phases. This is a matter of statutory interpretation.

---

[18] The jury verdicts initially required Jay and Jack to each pay $5,000,000 in punitive damages. The effect of the holding of the court of appeals was that Jack was required to pay Jay $5,000,000 in punitive damages, and Jay was required to pay $1 in punitive damages to Link Snacks and $1 in punitive damages to L.S.I.

Statutory interpretation is a question of law that the court reviews de novo. *Noffke ex rel. Swenson v. Bakke,* 2009 WI 10, ¶ 9, 315 Wis. 2d 350, 760 N.W.2d 156.

¶ 35. The court is also asked to clarify the scope of discretion granted to the clerk of circuit court when accepting motions and pleadings. This issue presents a question of law, subject to de novo review in this court. *Granado v. Sentry Ins.,* 228 Wis. 2d 794, 798, 599 N.W.2d 62 (Ct. App. 1999).

¶ 36. Finally, this court is asked to determine whether the benefit-estoppel doctrine required dismissal of certain aspects of Jay's appeal. This issue presents a question of law, subject to de novo review in this court. *Id.*

## IV. DISCUSSION

¶ 37. We first consider whether the court of appeals erred in restoring the $5,000,000 punitive damages award that Jack was ordered to pay Jay when it concluded that his postverdict motions were untimely filed under Wis. Stat. § 805.16. Second, we address whether Jay waived his right to appeal his judicial dissolution claim under Wis. Stat. § 180.1430(2)(b). Third, we consider whether Jay, under the benefit-estoppel doctrine, waived his right to appeal the question of whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.

### A. Jack's Postverdict Motion

¶ 38. We first address Jack's challenge to the court of appeals decision to restore the $5,000,000 punitive damages award that Jack was ordered to pay

Jay. As detailed above, during Phase II of the trifurcated trial, the circuit court empanelled a jury to resolve legal claims the parties had asserted against one another for money damages. After this six-week trial, the jury concluded, inter alia, that Jack had breached fiduciary duties to Jay, resulting in a $736,000 compensatory damages award and a $5,000,000 punitive damages award against Jack.

¶ 39. The jury also concluded, inter alia, that Jay had breached his fiduciary duties to Link Snacks and L.S.I., resulting in a judgment ordering Jay to pay $1 in compensatory damages to each company, along with punitive damages of $3,500,000 and $1,500,000 to Link Snacks and L.S.I., respectively.

¶ 40. Following Phase II of the trifurcated trial, the circuit court ordered the parties to file "motions after verdict" pursuant to Wis. Stat. § 805.16.[19] Jack and Jay each filed motions seeking to reduce their respective punitive damages awards on constitutional grounds.

¶ 41. The circuit court initially ruled, sua sponte, that Jack's postverdict motion was late because it was filed 21 days after the end of Phase II, one day beyond the statutory deadline. The circuit court later reconsidered this ruling, however, and, after reviewing Jack's motion on the merits, reduced the punitive damages

_____

[19] Wis. Stat. § 805.16(1) states: "Motions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by an order specifying the dates for filing motions, briefs or other documents." In the instant case, none of the parties requested an extension of time for filing postverdict motions within 20 days after the end of Phase II of the trifurcated trial and the circuit court did not extend the time.

20

award that Jack was ordered to pay Jay from $5,000,000 to $736,000.[20]

¶ 42. The court of appeals reversed the circuit court's order remitting Jack's punitive damages, and concluded that the circuit court erred in addressing Jack's postverdict motion because it was untimely filed under Wis. Stat. § 805.16.

¶ 43. Jack argues that the court of appeals erred in reversing the circuit court's decision to remit the punitive damages award against him. First, he maintains that the circuit court was correct in addressing his postverdict motion under *State v. Treadway*, 257 Wis. 2d 467. Second, Jack argues that Wis. Stat. § 805.16 is ambiguous and should therefore be liberally construed in Jack's favor. Third, he claims that if this court concludes the circuit court did not have jurisdiction to address Jack's tardy postverdict motion, then fairness requires that we adopt a bright-line rule that any documents delivered or received by the clerk of circuit court after business hours will be treated as having been filed on the following day. Jack notes that under this suggested bright-line rule, the circuit court in the instant case lacked jurisdiction to consider both Jack's and Jay's postverdict motions seeking a remittitur of their respective punitive damages awards. We address each argument in turn.

¶ 44. Jack first argues that the circuit court properly relied on the holding of *Treadway* to address his postverdict motion. *Treadway* involved a defendant who was found by a jury to be a sexually violent person. *Id.*, ¶ 4. Treadway failed to file his postverdict motions

---

[20] The circuit court based the reduction to the punitive damages award against Jack on a 1:1 ratio of compensatory to punitive damages.

21

within 20 days of the jury verdict, as required under Wis. Stat. § 805.16, but did file his motions within fifteen days after the commitment order.[21] *Id.*, ¶¶ 6–7. The court of appeals in *Treadway* affirmed the circuit court's decision to recognize the defendant's tardy postverdict motions because of the "piecemeal appeals" that would otherwise result and the constitutional rights that were in jeopardy. *Id.*, ¶ 9.

¶ 45. Here, the court of appeals reversed the circuit court, holding that *Treadway* did not apply because it narrowly addressed Wis. Stat. § 805.16 only as it applies to sexually violent person commitment cases.[22] We agree.

¶ 46. *Treadway* held that a sexually violent person who is committed by court order under Wis. Stat. Chapter 980 may preserve appellate rights by filing postverdict motions within 20 days of the commitment order, even if that is more than 20 days after the verdict itself. *Id.*, ¶ 11. As the court of appeals in the instant case correctly noted, *Treadway* was an intentionally narrow holding that was never meant to apply to all civil cases.

¶ 47. Jack argues that if this court agrees with the court of appeals' narrow interpretation of *Treadway*'s

[21] The circuit court in *Treadway* accepted the defendant's postverdict motions because of the "hybrid nature of sexual predator cases." Unlike in civil cases, the "jury's verdict [in sexual predator cases] does not represent the *final* disposition of the case." *State v. Treadway,* 2002 WI App 195, ¶ 6, 257 Wis. 2d 467, 651 N.W.2d 334.

[22] By "sexual violent person commitments," we refer to individuals who are found to be sexually violent and are ordered by the court to be placed in the custody of the Wisconsin Department of Health and Family Services for institutional care in a secure mental health unit or facility under Wis. Stat. § 980.065.

holding, *Treadway* should nevertheless be extended to apply to all civil trials with multiple phases. Otherwise, Jack argues, piecemeal appeals, multiple rounds of post-trial motions, and protracted litigation will result. We are not persuaded.

¶ 48. *Treadway*'s narrow holding that defendants may preserve their right to appeal by filing postverdict motions within 20 days of a commitment order, rather than 20 days after verdict, is inapplicable to complex civil cases with multiple phases for two reasons.

¶ 49. First, Chapter 980 trials require a separate dispositional phase after verdict. The circuit court in *Treadway* noted, and the court of appeals agreed, that this made the strict civil timeline for postverdict motions undesirable, and would lead to piecemeal appeals. This narrowly-tailored exception to the postverdict timeline for atypical, civil commitment proceedings is clearly distinguishable from standard complex civil actions.

¶ 50. Second, the *Treadway* court noted that precluding a sexually violent person's right to appeal because their counsel failed to file postverdict motions within 20 days of the verdict would be a "manifest miscarriage of justice." *Id.*, ¶ 10. No similar personal liberty interest is in peril in the instant case, nor is typically in peril in complex civil actions.

¶ 51. In fact, the Wisconsin legislature also agreed that the civil timeline for postverdict motions under Wis. Stat. § 805.16 should not apply to sexually violent person commitment cases. At the express suggestion of the court of appeals in *Treadway,* 257 Wis. 2d 467, ¶ 11, the Wisconsin legislature enacted Wis. Stat. § 980.038. As the court of appeals noted, by making ch. 980 appeals subject to the criminal procedures in

§ 809.30, the legislature effectively superseded the holding in *Treadway. N. Air Servs., Inc. v. Link,* No.2008AP2897, ¶ 7.

¶ 52. We also find unconvincing Jack's contention that failing to extend *Treadway* to all civil cases with multiple phases will cause confusion and protract litigation. As Jay correctly notes, Wis. Stat. § 805.16 already provides the flexibility that Jack suggests this court should read into the statute. If a judge believes that it would be more efficient to have postverdict motions filed after a later phase of a multi-phase trial, the circuit court can exercise its discretion to lengthen the 20–day time limit prescribed by § 805.16(1). Further, any party who believes it would be more efficient to have postverdict motions filed at a later phase in a multi-phase trial can simply request the circuit court to exercise its authority under § 805.16(1) to extend the statutory deadline for filing. Accordingly, we decline to extend *Treadway* to civil trials with multiple phases.

¶ 53. Jack next argues that Wis. Stat. § 805.16 is ambiguous and that rules of statutory construction therefore require that the statute be construed to preserve Jack's right to appeal.[23] Jack notes, for example, that § 805.16 does not explicitly say "jury verdict" and does not define "verdict."

¶ 54. Further, while conceding that courts have held Wis. Stat. § 805.16 applies to postverdict motions

---

[23] Jack cites *Sutherland Statutory Construction* for the general rule that "[s]tatutes giving the right of appeal are liberally construed, and an interpretation which will work a forfeiture of that right are not favored." 3 *Sutherland Statutory Construction* 67.08 (1974). Therefore, Jay argues, "ambiguities" should be construed to "preserve the right of appeal." *Wambolt v. West Bend Mut. Ins. Co.*, 2007 WI 35, ¶ 50, 299 Wis. 2d 723, 728 N.W.2d 670.

in jury cases, Jack argues that in such proceedings there is only one verdict and no question of when the time for filing motions begins to run. Jack argues that this ambiguity in the statutory language makes it unclear in multi-phase civil trials whether § 805.16 requires postverdict motions to be filed at the end of each phase of the trial, or at the end of the trial after all of the claims have finally been resolved. We reject this argument for two reasons.

■

¶ 55. First, Jack's argument that the applicability of Wis. Stat. § 805.16 is ambiguous because the statute does not explicitly use the phrase "jury verdict" or otherwise define "verdict" lacks merit. Since 1958, this court has defined "verdict" as including only a jury verdict and not a court order following a bench trial. *See Gillard v. Aaberg,* 5 Wis. 2d 216, 220, 92 N.W.2d 856 (1958). As Jay correctly notes, Wisconsin courts have continued *Gillard*'s interpretation when addressing the current postverdict motion statutes, holding that Wis. Stat. §§ 805.15 and 805.16 "apply specifically to motions after verdict in jury cases." *Manly v. State Farm Fire & Cas. Co.,* 139 Wis. 2d 249, 254, 407 N.W.2d 306 (Ct. App. 1987).

¶ 56. Also, an examination of the statutory scheme in Wis. Stat. ch. 805 further undermines Jack's argument that the language of Wis. Stat. § 805.16 is unclear. As this court has frequently noted, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes." *State ex rel. Kalal v. Circ. Ct. for Dane County,* 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. Wisconsin Stat. § 805.17, which directly follows § 805.16, applies specifically to motions that follow a bench trial. The

statutory language of § 805.16 and the statutory scheme of Chapter 805 clearly indicate the legislature intended § 805.16 to apply to jury trials.[24]

¶ 57. Second, while Jack argues that the statutory language of Wis. Stat. § 805.16 generates confusion regarding filing deadlines in complex civil actions, the record clearly shows that no confusion existed for Jack regarding the operation of § 805.16 in the instant case.[25] Confusion regarding the applicability of § 805.16 did not cause Jack to file his postverdict motions one day past the statutory deadline.[26] The circuit court clearly directed counsel that Wis. Stat. § 805.16 re-

---

[24] We assume that the statutory language expresses the legislature's intent and when the statutory language manifests a clear meaning, our inquiry ceases and we will apply that meaning. *Wisconsin Dep't of Revenue v. River City Refuse Removal, Inc.*, 2007 WI 27, ¶ 26, 299 Wis. 2d 561, 576, 729 N.W.2d 396. *See also Lincoln Sav. Bank, S.A. v. Wisconsin Dep't of Revenue*, 215 Wis. 2d 430, 443, 573 N.W.2d 522 (1998).

[25] In Jack's Petition for Review, he notes: "The appellate court's conclusion that the historical facts defy Jack's logic because he did not wait until final disposition of the case to file his post-trial motion is misplaced. At the time the issue of such motions was raised, Jack's counsel specifically questioned whether they were required to be filed at the end of Phase II, when the court still had claims to adjudicate in Phase III. [citation omitted] Nonetheless, the court instructed the parties to file the motions, so Jack complied. That, however, does not mean that Jack agreed that § 805.16 required his post-trial motion to be filed at that time." Petition at 14 n.7.

[26] We recognize that Jack is entitled to advocate an interpretation of Wis. Stat. § 805.16 that is inconsistent with his own interpretation of the statute during trial. We merely wish to clarify that Jack was not struggling during the trifurcated trial in navigating what he now argues are the enigmatic contours of Wis. Stat. § 805.16.

quired filing and service within 20 days of the jury's verdict at the end of Phase II of the trifurcated trial. Instead, as the court of appeals noted, Jack simply missed the statutory deadline required by § 805.16.

¶ 58. We conclude that Jack's argument that Wis. Stat. § 805.16 is ambiguous lacks merit.

¶ 59. Third, Jack argues that if this court declines to extend the holding of *Treadway* to all civil trials with multiple phases, we should adopt a bright-line rule that any documents intended for filing that have been delivered to or received by a clerk of circuit court after business hours will be treated as having been filed on the following day. Jack notes that, under this proposed bright-line rule, both Jack's and Jay's postverdict motions would be deemed untimely under Wis. Stat. § 805.16.[27]

¶ 60. As support for his proposed bright-line rule, Jack relies extensively on *St. John's Home,* 150 Wis. 2d 37, where this court held that papers filed with the clerk of the supreme court must be filed before the close of business on the last day of the applicable statutory deadline in order to be considered timely. Jack argues that the reasoning of our holding in *St. John's Home* applies to the instant case, and therefore, the bright-line rule adopted in *St. John's Home* should be extended to all pleadings received or delivered to circuit court clerks.

¶ 61. In *St. John's Home,* an attorney arrived at the supreme court clerk's office at approximately 5:15

---

[27] As explained above, Jay filed his postverdict motion at 4:32 p.m. on the last day of the applicable statutory deadline imposed by Wis. Stat. § 805.16. Jack filed his postverdict motion one day after the last day of the applicable statutory deadline. Consequently, under the bright-line rule suggested by Jack, both postverdict motions would be deemed late.

p.m. intending to deliver and file a petition for review. *Id.* at 41. The business hours of the supreme court clerk's office ended at 5:00 p.m. and it was closed for the day. *Id.* However, a law clerk employed by one of the justices of the court was leaving chambers and encountered the attorney in the hallway outside the clerk's office. In response to the attorney's request, the law clerk unlocked the supreme court clerk's office outer door and permitted the attorney to leave the petition for review on the receptionist's counter. *Id.* Because the petition for review had not been received in the supreme court clerk's office for filing before 5:00 p.m., the petition was deemed to be late and this court issued an order dismissing the petition on timeliness grounds. *Id.*

¶ 62. On a motion for reconsideration, we acknowledged that, on occasion, lawyers and litigants had arrived at the supreme court clerk's office after 5:00 p.m. to find the office still open and were permitted to file their documents. Concerned that the filing of petitions for review "should not be governed by happenstance," *id.* at 43, we established a bright-line rule that "[a]ny papers or documents delivered or received at the clerk's office after 5 p.m. will be treated as having been filed as of the following day." *Id.* at 45–46. We concluded that any rule that would condone after-hours delivery and receipt of a petition for review was "too problematic and cumbersome." *Id.* at 43–44.

¶ 63. In examining the question of whether the bright-line rule of *St. John's Home* should be extended to circuit court clerks, the reasoning of the court of appeals in *Granado* and *Hartford* provides guidance. *See Granado*, 228 Wis. 2d 794; *Hartford Citizens for Responsible Gov't v. City of Hartford Bd. of Zoning*, 2008 WI App 107, 313 Wis. 2d 431, 756 N.W.2d 454.

¶ 64. In *Granado,* the court of appeals addressed whether a summons and complaint given to the clerk of circuit court at his home at 9:30 p.m. on the last day of the applicable statutory of limitations period was timely filed. *Granado,* 228 Wis. 2d 794. The court of appeals held that "the legislature intended that a pleading is filed when it is properly deposited with the clerk." *Id.* at 796. In examining the meaning of "properly deposited," the court of appeals looked to the circuit court clerk's power and authority.

¶ 65. The *Granado* court observed that the clerk of circuit court is an elected constitutional officer.[28] As elected officials, the *Granado* court concluded that circuit court clerks "are entitled to some discretion in the performance of their duties." *Id.* at 800. Further, the *Granado* court noted that the circuit court clerk's authority "is conferred and may therefore be limited by the legislature." For example, Wis. Stat. § 59.20(3)(a) provides in pertinent part:

> Every . . . clerk of the circuit court . . . shall keep his or her office at the county seat in the offices provided by the county or by special provision of law; or if there is none, then at such place as the board directs . . . . All such officers shall keep their offices open during the usual business hours of any day except Sunday, as the board directs.

---

[28] Article VII, § 12 of the Wisconsin Constitution provides in pertinent part:

(1) There shall be a clerk of the circuit court chosen in each county organized for judicial purposes by the qualified electors thereof, who . . . shall hold office for two years, subject to removal as shall be provided by law.

. . . .

(5) The supreme court shall appoint its own clerk, and may appoint a clerk of circuit court to be the clerk of the supreme court.

29

¶ 66. The court of appeals in *Granado* emphasized the wide latitude provided by the legislature in setting the scope of the circuit court clerk's authority. "For example, the legislature has directed the county board to give the [circuit court] clerk an office that is open during some business hours at some point from Monday through Saturday. 59.20(3)(a) []. It did not restrict those hours or define usual business hours." *Granado,* 228 Wis. 2d at 802.

¶ 67. In light of the fact that the circuit court clerk is an elected constitutional officer and the legislature's "imprecise and inexhaustive guidelines indicating when and where the clerk's duties should be performed," the *Granado* court declined to extend the bright-line rule set forth in *St. John's Home* to restrict clerks of circuit court from accepting papers after business hours. *Id.* at 804. Instead, the court of appeals held that "the further removed from an office's legislative guidelines and usual business hours a transaction occurs, the less likely the papers have been properly deposited." *Id.* at 804–05. Further, the *Granado* court held that the clerk of circuit court, by accepting a summons and complaint at his home at 9:30 p.m. on the last day of the applicable statute of limitations period "exercised his discretion in a manner that impermissibly surpassed the legislative strictures he was subject to." *Id.* at 805.

¶ 68. In *Hartford,* 313 Wis. 2d 431, the court of appeals addressed whether the clerk of circuit court's office properly exercised its discretion in not accepting and filing a party's papers three minutes after the close of usual business hours. The hours of operation for the Washington County Clerk of Circuit Court's office were from 8:00 a.m. to 4:30 p.m. *Id.,* ¶ 20. The Washington County Clerk of Circuit Court had a rigid policy, which

was consistently applied, that any papers received after usual business hours would not be filed until the next business day. *Id.* The appellant in *Hartford* argued that, under *Granado,* the clerk of circuit court must exercise discretion in accepting pleadings after usual business hours. *Id.,* ¶ 9. The *Hartford* court rejected this interpretation of *Granado,* concluding that clerks of circuit court have "the discretion to adopt a policy, as long as the policy complies with the statutory guidelines indicating when and where the clerk's duties should be performed." *Id.,* ¶ 22. Accordingly, "the clerk may adopt a policy that is flexible or one that restricts filings to regular business hours." *Id.* The *Hartford* court concluded that the Washington County Clerk of Circuit Court properly exercised her discretion in not filing the appellant's papers until the following business day. *Id.,* ¶ 23.

¶ 69. After examining the holdings of *St. John's Home, Granado,* and *Hartford,* we agree with Jack's argument that extending the bright-line rule of *St. John's Home* would alleviate the risk of abuse and unpredictability. We conclude, however, that such a rigid rule would cause more problems than it would solve.

¶ 70. Accordingly, we would adopt the reasoning of *Granado* and *Hartford.* Jack's proposed bright-line rule would strip the circuit court clerk of the discretion to handle a variety of situations that require a certain amount of flexibility, such as long lines, understaffing, and other unanticipated events.[29] For example, as noted in *Granado,* a rigid rule would arguably prohibit the

[29] In *Giese v. Labor and Industry Review Commission,* the court of appeals addressed the question of whether a circuit court clerk abuses his or her discretion by refusing to accept papers for filing on the day they are received because they are unaccompanied by a prescribed filing fee. 153 Wis. 2d 212,

31

clerk of circuit court from having his or her office open after usual business hours on election night. "Similarly, the rule would prevent a clerk of circuit court traveling with a judge to a court outside the county seat from accepting pleadings or filing papers associated with a jury trial that continues beyond business hours." *Granado*, 228 Wis. 2d at 802.

¶ 71. This does not mean that the clerk of circuit court has a limitless amount of discretion in accepting pleadings after usual business hours. As *Granado* explained, when considering whether a clerk erroneously exercises his or her discretion in filing a pleading, "the further removed from an office's legislative guidelines and usual business hours a transaction occurs, the less likely it is that the papers have been properly deposited." *Granado,* 228 Wis. 2d at 804–05. We believe this flexible case-by-case approach provides an appropriate amount of discretion to the clerk of circuit court.

213–14, 450 N.W.2d 489 (Ct. App. 1989). The court noted the legislature's intention to have "uniform appellate procedures across the state," but held that this desired uniformity did not extend to the discretion provided to the circuit court clerk under Wis. Stat. § 59.40(3)(a) (formerly § 59.42(1)). *Id.* at 216. Rather, unlike the statute governing appellate practice, § 59.40(3)(a) "requires each circuit court clerk to exercise his or her discretion within the respective circuit. Although this may result in some inconsistencies among various counties, the plain language of the statute compels this result." *Id.* Our holdings in *St. John's Home* and the instant case align with the legislature's intent to have uniform appellate procedure across the state. The bright-line rule in *St. John's Home* recognized the need for a uniform procedure for the timely filing of petitions for review in order to invoke our appellate jurisdiction. Unlike *St. John's Home,* however, the instant case does not involve appellate procedure and instead considers the legislatively-prescribed discretion of the clerk of circuit court to accept filings after usual business hours.

¶ 72. The instant case is a prime example of why this flexible approach is preferable to Jack's proposed bright-line rule. Jay's counsel called the Washburn County Clerk of Circuit Court at 4:17 p.m. on the twentieth day following the jury's verdict for Phase II of the trifurcated trial—the final day the parties could timely file their postverdict motions under Wis. Stat. § 805.16—to tell the clerk they would be late, but they were en route to the clerk's office. At 4:32 p.m., two minutes after the close of usual business hours, Jay's counsel submitted Jay's postverdict motions, which the clerk accepted and filed. We conclude this was not an abuse of the circuit court clerk's discretion.[30]

■■

¶ 73. We would hold it is within the clerk of circuit court's discretion as an elected constitutional officer to accept and file pleadings received after the end of usual business hours, so long as that discretion is exercised reasonably and is within the guidelines provided by the legislature.[31]

---

[30] For the reasons stated above, we believe the bright-line rule of St. John adopted by the majority has the potential to lead to both inequitable and unduly harsh results.

[31] Jack further argues that permitting the clerk of the circuit court to determine when filings are "timely" or not is an exercise of judicial power, which is outside the scope of the ministerial and clerical acts a circuit court clerk is permitted to exercise by statute. We find this to be unconvincing.

Wisconsin Stat. § 59.40(2) provides, in part, that the clerk of circuit court shall "[f]ile and keep all papers properly deposited with him or her in every action or proceeding unless required to transmit the papers. . . . " Further, Wis. Stat. § 59.20(3)(a), which provides that the county board is to give the county clerk an office that is open during some business hours at some point from Monday through Saturday, does not

¶ 74. We therefore would decline to adopt Jack's proposed bright-line rule, and affirm the order of the court of appeals reinstating the punitive damages award against Jack.

## B. Jay's Judicial Dissolution Claim

¶ 75. Jay argues that the court of appeals erred in holding that the benefit-estoppel doctrine precluded Jay from appealing the circuit court's conclusion that he was not oppressed as a matter of law.[32]

---

restrict those hours or define usual business hours. *See Granado*, 228 Wis. 2d at 802.

Regardless, it is beyond dispute in the instant case that Jack filed his postverdict motion with the clerk of Washburn County one day after the 20–day statutory guideline mandated by Wis. Stat. § 805.16. The circuit court "loses its competency to consider postverdict motions filed after the twenty day deadline, unless the court has granted an extension within that time." *Ahrens Cadillac Oldsmobile, Inc. v. Belongia*, 151 Wis. 2d 763, 767, 445 N.W.2d 744 (Ct. App. 1989). *See also Hartford Ins. Co. v. Wales*, 138 Wis. 2d 508, 406 N.W.2d 426 (1987) (similarly concluding that "the circuit court lacked the competency to exercise its discretion to decide the [postverdict] motions"). Accordingly, the court of appeals correctly held that the circuit court improperly considered the merits of Jack's tardy postverdict motion.

This holding of the court of appeals did not, however, strip Jack of his ability to appeal his tardy postverdict motion. As this court in *Hartford* explained, "[n]umerous Wisconsin cases have held that a party's failure to properly or timely raise issues in the trial court by postverdict motions results only in a waiver of the opportunity for an appeal *as of right* on those issues. The reviewing court does not lose discretion to consider such issues but may consider them in its discretion." *Hartford Ins.*, 138 Wis. 2d at 510–11. Here, the court of appeals simply declined to do so.

[32] "An allegation of oppression is not a claim for relief, but rather, is a legal standard to be fulfilled before a circuit court

34

¶ 76. While still a shareholder in Link Snacks, Jay argued to the circuit court that he was entitled to a buyout of his shares at fair value on the basis of shareholder oppression, as a remedy in lieu of judicial dissolution under Wis. Stat. § 180.1430. Wisconsin Stat. § 180.1430 provides, in relevant part:

> The circuit court . . . may dissolve a corporation in a proceeding:
>
> . . . .
>
> (2) By a shareholder, if any of the following is established:
>
> . . . .
>
> (b) That the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive, or fraudulent.

¶ 77. During Phase III of the trifurcated trial, the circuit court denied Jay's claim for dissolution under Wis. Stat. § 180.1430 and granted Link Snacks' motion for specific enforcement of the Buy-Sell Agreement.

---

may order liquidation of a corporation based on the acts of those who control it." *Reget v. Paige*, 2001 WI App 73, ¶ 23, 242 Wis. 2d 278, 626 N.W.2d 302. Although "oppression" is not defined in Wis. Stat. § 180.1430, we defined oppressive conduct for the purposes of this statute in *Jorgensen:*

> [B]urdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.

*Jorgensen v. Water Works, Inc.*, 218 Wis. 2d 761, 783, 582 N.W.2d 98 (Ct. App. 1998) (quoting *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 628–29, 507 P.2d 387 (1973)).

35

The court therefore required Jay to surrender his shares in Link Snacks for their fair market value of $19,400,000.[33] On June 30, 2009, Jay complied with the circuit court order granting specific enforcement of the Buy-Sell Agreement and surrendered his shares in Link Snacks.

¶ 78. The court of appeals concluded that, under the benefit-estoppel doctrine, Jay waived his right to appeal the circuit court's judgment denying his oppression claim under Wis. Stat. § 180.1430.

■■

¶ 79. The benefit-estoppel doctrine provides that, "[a]s a general rule, . . . if a benefit received is dependent upon, or was granted as a condition of, the order or judgment attacked the party ought not be permitted to carry on his warfare." *Wyandotte Chemical Corp.*, 66 Wis. 2d at 592. Consequently, "a party waives his right to appeal when he accepts the fruits of a judgment to which he may not be entitled if his appeal succeeds." *Stevens Constr. Corp. v. Draper Hall, Inc.*, 73 Wis. 2d 104, 111, 242 N.W.2d 893 (1976). However, if the "order or judgment under which the person is granted a favor are independent and separable from those sought to be overturned, then he may appeal a right denied in the trial court." *Wyandotte Chemical Corp.*, 66 Wis. 2d at 592.

---

[33] As stated above, during Phase III, the parties stipulated to the submission of evidence establishing that, as of July 31, 2005, the fair value of Jay's shares in Link Snacks was $31,800,000, and the fair market value was $19,400,000. The Buy-Sell Agreement provided that the departing shareholder's shares were to be appraised on the last day of the month preceding the shareholder's departure from the company. July 31, 2005 was the last day of the month preceding Jay's departure from Link Snacks, and, accordingly, was the date Jay's shares were appraised.

¶ 80. The court of appeals reasoned that, because Jay had accepted payment for his shares in Link Snacks, Jay waived his right to appeal the circuit court judgment that granted Link Snacks specific performance of the Buy-Sell Agreement and denied Jay's request for judicial dissolution. We affirm the court of appeals holding that Jay may not appeal the circuit court's judgment denying Jay's oppression claim, but on different grounds.

■

¶ 81. Link Snacks argues that Jay, by surrendering his shares in Link Snacks under the Buy-Sell Agreement, lost his shareholder status. Consequently, Jay is no longer a Link Snacks "shareholder" entitled to invoke Wis. Stat. § 180.1430(2)(b). We agree.

¶ 82. Wisconsin Stat. § 180.1430(2)(b) requires that a party pursuing a dissolution claim be a "shareholder."[34] A "shareholder" is defined by the Wisconsin Business Corporation Law as "the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." § 180.0103(14).

¶ 83. On June 30, 2009, when Jay surrendered his shares in Link Snacks under the Buy-Sell Agreement, he was no longer a "shareholder" in Link Snacks, as that term is defined by the Wisconsin Business Corporation

---

[34] As detailed above, whether Jay has standing to continue to seek dissolution of Link Snacks under Wis. Stat. § 180.1430(2)(b) presents an issue of law. This is a matter of statutory interpretation. The goal of statutory interpretation is to ascertain and give effect to the legislature's intent. *Lake City Corp. v. City of Mequon*, 207 Wis. 2d 155, 162, 558 N.W.2d 100 (1997). To achieve this goal, the court first resorts to the statute's plain language. *Id.*

Law.[35] Consequently, Jay no longer has standing to maintain an oppression claim under Wis. Stat. § 180.1430(2)(b).

¶ 84. Jay does not dispute that he is no longer a shareholder in Link Snacks. He contends, however, that a party, by losing shareholder status, does not lose individual claims that have fully accrued while the party was still a shareholder. Jay relies on one case, *Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, 316 Wis. 2d 640, 764 N.W.2d 904, to support his argument that he maintains standing to appeal his judicial dissolution claim. The holding of *Notz*, however, does not extend to Jay's judicial dissolution claim and is therefore inapplicable to the instant case.

¶ 85. *Notz* involved a minority shareholder who brought suit against a majority shareholder, among others, claiming that the defendants had breached their fiduciary duties and had oppressed the minority shareholder under Wis. Stat. § 180.1430(2)(b). *Id.*, ¶ 10. The circuit court in *Notz* dismissed Notz's breach of fiduciary duty claims but declined to dismiss the judicial dissolution claim based on allegedly oppressive conduct. *Id.*, ¶ 11. Both parties appealed the circuit court's order, and while the appeal was pending, the defendant corporation initiated a cash-out merger[36] under Wis. Stat. §§ 180.1101(2)(c) and 180.1103(3). *Id.*, ¶ 12. The

---

[35] Wisconsin's business corporation law is encompassed in Wis. Stat. Ch. 180 and is cited to as "Wisconsin Business Corporation Law." *See* Wis. Stat. § 180.0101.

[36] A cash-out merger occurs when "Corporation A, which holds a controlling interest in Corporation B, uses its control to merge Corporation B into itself or into a wholly owned subsidiary, and the minority shareholders in Corporation B are, in effect, forced to sell their stock." 19 Am. Jur. 2d *Corporations* § 2179.

merger was successful and consequently stripped Notz of his shareholder status in the defendant corporation. *Id.* The court of appeals concluded that Notz lost standing because he was no longer a shareholder. On appeal, however, this court reversed the court of appeals and concluded that Notz had not lost standing. *Id.*, ¶ 39.

¶ 86. Jay argues that, like *Notz,* his standing to bring a judicial dissolution claim against Link Snacks vested when he initially made the judicial dissolution claim at the circuit court level. Jay, however, ignores a key distinction between Notz and the instant case: the question of standing in Notz centered on Wis. Stat. § 180.1106(1)(d), which expressly discusses standing in the context of a cash-out merger.

¶ 87. Wisconsin Stat. § 180.1106(1)(d), the statute at issue in *Notz,* provides:

> A civil, criminal, administrative, or investigatory proceeding pending by or against any business entity that is a party to the merger may be continued as if the merger did not occur, or the surviving business entity may be substituted in the proceeding for the business entity whose existence ceased.

As the court in *Notz* emphasized, the statute was written specifically to preserve a claim in the event a party was stripped of their status as a shareholder.[37]

---

[37] The statutory language of Wis. Stat. § 180.1106(1)(d), which permits the shareholder's status as a shareholder to vest once suit has been brought against the defendant business entity, is consistent with all other state jurisdictions. As we have noted in other cases construing Wis. Stat. § 180.1106, this provision is based on Model Business Corporation Act § 11.07, "Effect of Merger or Share Exchange." *See generally* Model Bus.

¶ 88. Unlike *Notz,* Jay's shareholder status was not lost because majority shareholders completed a cash-out merger. Wisconsin Stat. § 180.1106(1)(d), which preserves a plaintiff's standing in such a situation, is therefore inapplicable. The applicable statute in the instant case is Wis. Stat. § 180.1430(2)(b), which expressly requires that a party be a "shareholder" in order to bring a claim against a business entity for judicial dissolution. Nothing in the statutory language of § 180.1430(2)(b) indicates a legislative intent to allow a non-shareholder to bring a claim for judicial dissolution.

¶ 89. Interpreting Wis. Stat. § 180.1430 to require a plaintiff to be a shareholder in order to bring a judicial dissolution claim is not only a straightforward reading of the statute's plain language; it is also the most logical interpretation given the statute's purpose. A shareholder oppression claim is, by definition, a claim brought by an individual shareholder in his or her capacity as shareholder for injury done to his individual interests that arise out of his or her share ownership.

¶ 90. The purpose of a shareholder oppression claim is to provide a method of recourse to minority shareholders who are subject to "burdensome, harsh, and wrongful conduct" at the hands of the majority shareholder. By forcing a corporation to dissolve, it enables a minority shareholder to obtain value for his or her shares. It is contrary to reason that a party could assert a claim for judicial dissolution—an extreme remedy wherein minority shareholders may obtain value for their shares—against a company in which the party owns no shares.

Corp. Act Ann. § 11.07 cmt. (4th ed. 2008) (Statutes) (listing all fifty states as having adopted this rule under the Model Business Corporation Act).

¶ 91. Jay argues that he was stripped of his shareholder status because of the order issued by the circuit court granting specific enforcement of the Buy-Sell Agreement, and that he never intended to lose his right to appeal his oppression claim. The record supports Jay's argument that he intended to maintain his right to appeal his judicial dissolution claim for the allegedly oppressive conduct he suffered as a minority shareholder in Link Snacks.

¶ 92. In the instant case, however, Jay's intention to maintain standing to appeal the circuit court's judgment denying his oppression claim is irrelevant. Once Jay transferred his shares to Link Snacks under the Buy-Sell Agreement, he lost his status as a shareholder in Link Snacks, and consequently lost standing to bring a judicial dissolution claim under Wis. Stat. § 180.1430. Jay's intention to maintain standing does not trump the clear statutory language of § 180.1430, which requires a plaintiff to be a shareholder in order to bring a judicial dissolution claim.

¶ 93. The circuit court concluded in Phase III of the trifurcated trial that Jay had not, as a matter of law, been oppressed by the majority shareholders in Link Snacks. Having reached the conclusion that Jay was not oppressed, the circuit court granted specific enforcement of the Buy-Sell Agreement. Under the terms of the Buy-Sell Agreement, Jay surrendered his shares in Link Snacks for the appraised fair market value of the shares. Jay never argued that the Buy-Sell Agreement was not a valid, enforceable agreement. Instead, Jay's oppression argument has centered on being subject to "burdensome, harsh, and wrongful conduct" that effectively "squeezed" Jay out of Link Snacks, thereby improperly triggering the Buy-Sell Agreement. Having been allegedly "squeezed" out of the company, Jay seeks,

under the judicial dissolution statute, the difference between the fair value of his shares in Link Snacks—which he argues is a widely accepted damages remedy in judicial dissolution cases—and the fair market value of his shares in Link Snacks, which Jay is owed under the terms of the Buy-Sell Agreement.

¶ 94. Jay's theory of damages for his oppression claim under Wis. Stat. § 180.1430 is well articulated, but the judicial dissolution statute simply is not the proper vehicle in which to bring his claim. Jay is no longer a shareholder in Link Snacks. Wisconsin Stat. § 180.1430(2)(b) is a judicial dissolution statute wherein shareholders may move to dissolve a business entity when they have been subject to oppressive conduct. We therefore conclude that Jay does not have standing to appeal his oppression claim under § 180.1430(2)(b).

C. Jay's Fiduciary Duty Damages Argument

¶ 95. Jay next argues that the court of appeals erred in holding that Jay, under the benefit-estoppel doctrine, waived his right to appeal the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.[38] The court of appeals denied Jay's appeal relating to his fiduciary duty damages theory for the same reason it

_____

[38] On January 11, 2011, and June 16, 2011, Link Snacks submitted letters to this court with supplemental information related to Jay's acceptance of benefits under the Buy-Sell Agreement. On January 14, 2011, and June 20, 2011, Jay submitted letters in response. For the reasons set forth below, we are not persuaded by Link Snack's argument that Jay is barred from raising his breach of fiduciary duty argument

denied his oppression claim, relying on the principle that "a party waives his right to appeal when he accepts the fruits of a judgment to which he may not be entitled if his appeal succeeds." *Stevens Constr. Corp.,* 73 Wis. 2d at 111.

¶ 96. The court of appeals reasoned that Jay could not prevail on his appeal of the circuit court's decision to limit the evidence Jay could present regarding his fiduciary duty damages theory relating to his breach of fiduciary duty claims against Jack and Troy unless specific enforcement of the Buy-Sell Agreement was reversed. Therefore, because Jay already accepted payments under the Buy-Sell Agreement, he waived his right to appeal the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy under the benefit-estoppel doctrine.

¶ 97. We conclude the court of appeals erred in dismissing Jay's appeal of the circuit court's decision to limit the evidence Jay could present regarding his fiduciary duty damages theory relating to his breach of fiduciary duty claims against Jack and Troy on the basis of the benefit-estoppel doctrine. In order to fully articulate why the court of appeals erred in its decision to dismiss Jay's appeal, it is necessary to explain Jay's theory of damages relating to his breach of fiduciary duty claims against Jack and Troy in more detail.

¶ 98. During Phase II of the trifurcated trial, the jury found that Jack and Troy breached fiduciary duties owed to Jay as a minority shareholder. As damages for Jack's and Troy's breach of fiduciary duties, Jay sought

because he accepted benefits under the Buy-Sell Agreement. Accordingly, these post-argument submissions need not be addressed.

the difference between the fair value of Jay's shares and the fair market value of Jay's shares. Jay argues that the difference between the fair value and the fair market value of his shares is a well-established theory of damages in breach of fiduciary duty cases and would effectively disgorge any profit that Jack and Troy obtained by their tortious conduct.

¶ 99. The circuit court disagreed with Jay, and declined to introduce Jay's theory of damages to the jury.[39] On appeal, the court of appeals did not reach the substantive issue of whether the circuit court erred in not accepting Jay's theory of damages because it concluded Jay had waived his right to appeal under the benefit-estoppel doctrine.

¶ 100. As noted above, the benefit-estoppel doctrine holds that "an appellant is not permitted to take an appeal when he voluntarily accepts a benefit which is dependent upon that part of the order or judgment which he attacks on appeal." *Id.* at 110.

---

[39] In pretrial and trial rulings, the circuit court denied Jay's request to present evidence to the jury in support of Jay's fiduciary duty damages theory. The circuit court precluded Jay from offering evidence on the fair value of his shares in Link Snacks and also rejected Jay's proposed damages instruction.

The circuit court reasoned that any error in excluding Jay's fiduciary duty damages theory from the jury was harmless:

> If the jury finds a breach of fiduciary duty, such a finding by necessity probably requires a finding by the Court that oppression occurred, thus entitling Jay to full value as his remedy. At least that's what appears to be the implication from both the case law and the other professional materials the Court has read.

The circuit court concluded that Jay was limited to seeking as damages any diminution in the value of his shares that he could prove were caused by Jack and Troy's tortious conduct, plus any "perks" that Jack and Troy received but that Jay was denied.

¶ 101. Here, the benefits that Jay has accepted under the Buy-Sell Agreement are not—in any conceivable way—dependent on the question of whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. For one, Jay is not appealing the specific enforcement of the Buy-Sell Agreement under which Jay has received payments for his shares in Link Snacks. Under no scenario could the payments that Jay has received under the Buy-Sell Agreement be put in jeopardy by pursuing his appeal of the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. And as this court explained in *Stevens Construction*, "[a]s long as the party accepting money has not put his right to that money in jeopardy in his own appeal, there is no waiver . . . ." *Id.* at 111.

¶ 102. Further, Jay's fiduciary duty damages argument involves what Jack and Troy allegedly owe Jay in tort damages. The specific enforcement of the Buy-Sell Agreement, which is not even being challenged on appeal, involves what Link Snacks contractually owes Jay under the Buy-Sell Agreement. Put simply, Jay's appeal of the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy and the specific performance of the Buy-Sell Agreement —the enforcement of which Jay is not appealing—are different claims involving different parties.[40] Therefore, if Jay was successful in his appeal of the circuit court's

[40] *See, e.g., Riley v. Lawson,* 210 Wis. 2d 478, 489, 565 N.W.2d 266 (Ct. App. 1997) (holding that the appeal of claims

45

decision to limit the evidence Jay could present regarding his fiduciary duty damages theory relating to his breach of fiduciary duty claims against Jack and Troy, the benefits he has accepted under the Buy-Sell Agreement would, without question, remain untouched. Consequently, the benefit-estoppel doctrine is inapplicable to Jay's appeal of the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.

¶ 103. We therefore reverse and remand to the court of appeals to decide Jay's appeal of the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.[41]

---

involving different defendants could proceed because they did not challenge the judgment relating to the benefit).

[41] Justice Ziegler's concurrence notes that the circuit court was statutorily required, pursuant to Wis. Stat. § 805.15(6), to order a new trial because neither Jay, Link Snacks, nor L.S.I. accepted the circuit court's reduction of the punitive damages the jury awarded each of them.

Wisconsin Stat. § 805.15(6) provides:

> If a trial court determines that a verdict is excessive or inadequate . . . the court shall determine the amount which as a matter of law is reasonable, and shall order a new trial on the issue of damages, unless within 10 days the party to whom the option is offered elects to accept judgment in the changed amount.

We acknowledge that the unambiguous language of Wis. Stat. § 805.15(6) required the circuit court to grant the parties "the option of remitting the excess over and above such sum as the court [had] determine[d] [was] the reasonable amount of . . . damages, or of having a new trial on the issue of damages." *Powers v. Allstate Ins. Co.,* 10 Wis. 2d 78, 92, 102 N.W.2d 393 (1960) (subsequently codified in Wis. Stat. § 805.15(6)). Prior to announcing its decision to remit the

## V. CONCLUSION

¶ 104. Accordingly, we hold the following:

(1) The circuit court erred in remitting the award of punitive damages against Jack. The circuit court's

punitive damages against Jay and Jack, the circuit court noted it was "run[ning] a considerable risk" by doing so. The record is silent as to what specific risk the circuit court perceived it was taking.

Although the precise nature of the circuit court's perceptions are unknown to us, we can say with certainty that we share its general observation that it took a considerable risk when it ordered a reduction in the respective parties' punitive damages awards without simultaneously providing them with the option of a new trial. Specifically, the risk the circuit court took was that one or more of the parties would seek appellate relief from the circuit court's failure to offer the option of a new trial on the issue of damages and that such a new trial would be ordered. This, however, the parties did not do.

That being said, it would not be appropriate for us to order a new trial. First, no party asked the circuit court to reconsider its failure to comply with Wis. Stat. § 805.15(6). Second, no party requested the court of appeals to direct the circuit court to order a new trial pursuant to § 805.15(6). Finally, no party has made the argument to us that they are entitled to a new trial on the issue of damages pursuant to § 805.15(6).

We think it more prudent to follow our long-standing practice of refraining from taking up issues which have been neither presented nor argued before us, and accordingly, do not remand to the circuit court for a new trial on the issue of damages. *See Dairyland Greyhound Park, Inc. v. Doyle,* 2006 WI 107, ¶ 335, 295 Wis. 2d 1, 719 N.W.2d 408 (Roggensack, J., concurring in part, dissenting in part) ("As various members of this court have said, we should not 'reach out and decide issues' that were not presented to the court by the parties"). *See also Bartley v. Thompson,* 198 Wis. 2d 323, 341–42 n.10, 542 N.W.2d 227 (Ct. App. 1995) (holding that the court will not consider an issue that the parties failed to develop).

reliance on *Treadway* in considering Jack's tardy postverdict motion was misplaced. *Treadway* does not apply to multi-phase civil actions, such as the instant case. Further, we would decline to extend the bright-line rule of *St. John's Home* in order to limit the discretion of the clerk of circuit court in accepting pleadings received after usual business hours. Accordingly, we affirm the court of appeals in its conclusion the circuit court improperly considered Jack's postverdict motion.

(2) The court of appeals properly rejected Jay's oppression claim under Wis. Stat. § 180.1430(2)(b). We do not address, however, whether Jay waived his right to bring his oppression claim under the benefit-estoppel doctrine because we conclude he does not have standing to appeal his oppression claim under Wis. Stat. § 180.1430(2)(b). The statutory language of Wis. Stat. § 180.1430(2)(b) clearly states that a party must be a "shareholder" in order to seek judicial dissolution of a corporation. Jay lost his status as a shareholder in Link Snacks when he surrendered his shares under the Buy-Sell Agreement. Therefore, we affirm the court of appeals on this issue, but on different grounds.

(3) Jay did not, under the benefit-estoppel doctrine, waive his right to appeal the circuit court's decision to limit the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. The contractual obligations set forth in the Buy-Sell Agreement, which were enforced by the circuit court, would not be affected if Jay, on appeal, were successful in arguing that the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy. Consequently, the benefit-estoppel doctrine is

48

inapplicable to Jay's appeal of the circuit court's decision to limit the evidence Jay could present regarding his fiduciary duty damages theory relating to his breach of fiduciary duty claims against Jack and Troy. We therefore reverse and remand to the court of appeals to decide whether the circuit court erred in limiting the evidence Jay could present regarding his theory of damages relating to his breach of fiduciary duty claims against Jack and Troy.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and cause remanded.

¶ 105. ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that the circuit court improperly considered Jack's untimely motion after verdict, that Jay may no longer maintain a claim for judicial dissolution, and that benefit-estoppel doctrine does not preclude Jay from appealing the circuit court's decision to limit the evidence he could present in support of his breach of fiduciary duty claims.

¶ 106. For the reasons set forth in Justice Ziegler's concurrence, I join her conclusion that the court should overrule *Granado v. Sentry Insurance,* 228 Wis. 2d 794, 599 N.W.2d 62 (1999) and prospectively apply the bright-line rule articulated in *St. John's Home of Milwaukee v. Continental Casualty Co.,* 150 Wis. 2d 37, 441 N.W.2d 219 (1989), to circuit court clerks.

¶ 107. I do not join Justice Ziegler's concurrence because I would not address the applicability of Wis. Stat. § 805.15(6). *See* Justice Ziegler's concurrence, ¶ 140. Neither party addressed the applicability of that statute in his argument to this court. Accordingly, I respectfully concur in the mandate.

49

¶ 108. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

¶ 109. ANNETTE KINGSLAND ZIEGLER, J. (*concurring*). I join the conclusions of the majority opinion, namely that (1) the circuit court improperly considered Jack Link's untimely motion after verdict; (2) Jay Link does not have standing to appeal his oppression claim under Wis. Stat. § 180.1430(2)(b); and (3) Jay did not waive his right to appeal from the circuit court's order that precluded him from introducing to the jury his theory of damages for breach of fiduciary duty. *See* majority op., ¶ 11.

¶ 110. As to the first issue, however, I write separately and concur because I believe this case underscores the disparate treatment that can result under the court of appeals' rationale in *Granado v. Sentry Insurance,* 228 Wis. 2d 794, 599 N.W.2d 62 (Ct. App. 1999). Unlike the majority, I would overrule *Granado* and, in the future, apply the bright-line rule articulated in *St. John's Home of Milwaukee v. Continental Casualty Co.,* 150 Wis. 2d 37, 441 N.W.2d 219 (1989), to the clerks of circuit court.[1] A clerk of circuit court has the discretionary authority

---

[1] In light of the fact that *Granado v. Sentry Insurance,* 228 Wis. 2d 794, 599 N.W.2d 62 (Ct. App. 1999), is a published decision and that in the past clerks of circuit court have filed papers received after the normal business hours, I concur with the majority's holding in the instant case. *See St. John's Home of Milwaukee v. Cont'l Cas. Co.,* 150 Wis. 2d 37, 43–44, 441 N.W.2d 219 (1989). For future cases, however, I would apply the bright-line rule in *St. John's Home* to clerks of circuit court.

Chief Justice Shirley S. Abrahamson, Justice Ann Walsh Bradley, Justice N. Patrick Crooks, and I overrule *Granado.* Accordingly, the majority of this court holds that *Granado* is overruled and the bright-line rule in *St. John's Home* prospectively applies to clerks of circuit court.

to accept papers after-hours but cannot exercise the judicial power to determine whether such papers were timely filed. Rather, even if papers are somehow delivered to the clerk after-hours, the clerk should treat the papers as having been filed on the following business day.

¶ 111. A clerk of circuit court should strive to treat all litigants the same. When access to the clerk, rather than courthouse hours, is determinative of whether papers are timely filed and thus can be considered by the circuit court judge, the result is unequal treatment under the law. Equal treatment under the law is fundamental to our system of justice, and I cannot support a practice that operates otherwise.

## I. PROCEDURAL HISTORY

¶ 112. To explain my position, it is necessary to first recount certain aspects of this case's procedural history.

¶ 113. On July 9, 2008, after a six-week trial, a jury found, *inter alia*, that Jack breached his fiduciary duties to Jay and that Jay breached his fiduciary duties to Link Snacks, Inc. (Link Snacks) and to L.S.I., Inc. (L.S.I.).[2]

¶ 114. To compensate Jay for the damage caused by Jack's breach of fiduciary duties, the jury awarded Jay $736,000. In addition, upon finding that Jack acted maliciously toward Jay, the jury awarded Jay $5,000,000 in punitive damages.

¶ 115. At the same time, to compensate Link Snacks and L.S.I. for the damage caused by Jay's breach of fiduciary duties, the jury awarded each company $1. In addition, upon finding that Jay acted maliciously

---

[2] Link Snacks was then owned by Jack, Troy, and Jay Link, and L.S.I. was then owned by Troy and Jay Link.

toward Link Snacks and L.S.I., the jury assessed a total of $5,000,000 in punitive damages against Jay—$3,500,000 to be paid to Link Snacks and $1,500,000 to be paid to L.S.I.

¶ 116. Consequently, with regard to punitive damages, the jury verdict effectively created a wash. That is, the jury awarded Jay $5,000,000 in punitive damages and, at the same time, assessed $5,000,000 in punitive damages against Jay.

¶ 117. After the verdict was announced, the circuit court specifically instructed the parties that, pursuant to Wis. Stat. § 805.16(1),[3] any motions after verdict must be filed within 20 days. In other words, the parties were required to file their motions after verdict by July 29, 2008.

¶ 118. Jack and Jay filed cross motions after the verdict. In relevant part, both Jack and Jay sought a new trial under Wis. Stat. § 805.15(6),[4] arguing that the punitive damages assessed against them were grossly excessive.

---

[3] Wisconsin Stat. § 805.16(1) states: "Motions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by an order specifying the dates for filing motions, briefs or other documents." In this case, within 20 days after the verdict was rendered, the circuit court did not set a longer time for the parties to file their motions after verdict.

[4] Wisconsin Stat. § 805.15(6) provides:

Excessive or Inadequate Verdicts. If a trial court determines that a verdict is excessive or inadequate, not due to perversity or prejudice or as a result of error during trial (other than an error as to damages), the court shall determine the amount which as a matter of law is reasonable, and shall order a new trial on the issue of damages, unless within 10 days the party to whom the option is offered elects to accept judgment in the changed amount. If the option is not accepted, the time period for petitioning the court of

52

¶ 119. The business hours of the Washburn County Clerk of Circuit Court are 8:00 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. On July 29, 2008, the 20th day after the jury rendered its verdict in this case, at 4:17 p.m., Jay's attorney called the office of the Washburn County Clerk of Circuit Court, informing the clerk that he was on his way to the courthouse to file Jay's motion after verdict. Jay filed his motion at 4:32 p.m., two minutes after the office closed. Nevertheless, the clerk of circuit court accepted Jay's filing and stamped the motion as being filed on July 29, 2008. The clerk explained, "I find that [Jay's attorney's] documents were filed in a timely manner on July 29, 2008 due to the fact that his office had given the clerk of court office a call regarding the filing . . . ."

¶ 120. Jack, on the other hand, mailed his motion after verdict from Chicago to the Washburn County Clerk of Circuit Court. The motion was mailed on July 29, 2008, but it was not received and filed by the clerk until July 30, 2008, at 11:19 a.m.

¶ 121. On July 31, 2008, the circuit court, *sua sponte,* issued an order finding that both Jack's motion after verdict and Jay's motion after verdict were filed after the Washburn County Clerk of Circuit Court officially closed on July 29, 2008. The circuit court concluded that it lacked competency to consider Jack's motion because the motion was filed on July 30, 2008, one day after the strict 20–day deadline set forth in Wis. Stat. § 805.16(1). However, the circuit court concluded that Jay's motion was timely filed. The circuit court reasoned, "[The clerk of circuit court] filed the pleading and this Court is bound by the date stamped by the Clerk."

---

appeals for leave to appeal the order for a new trial under ss. 808.03(2) and 809.50 commences on the last day of the option period.

¶ 122. On August 6, 2008, the circuit court reconsidered its earlier ruling and decided to consider the merits of Jack's motion after verdict—in addition to the merits of Jay's motion after verdict. The circuit court concluded that the punitive damages assessed against both Jack and Jay were unconstitutionally excessive and that a more appropriate ratio between the compensatory damages and punitive damages is one to one. Consequently, the circuit court reduced the parties' punitive damages awards as follows: the court reduced Jay's punitive damages award from $5,000,000 to $736,000 (equal to his award of compensatory damages); the court reduced Link Snacks' punitive damages award from $3,500,000 to $1 (equal to its award of compensatory damages); and reduced L.S.I.'s punitive damages award from $1,500,000 to $1 (equal to its award of compensatory damages). As a practical matter, after the circuit court's remittitur of the punitive damages awards, the awards were no longer a wash as far as Jay was concerned; rather, the circuit court's reduction created a $735,998 award in Jay's favor.

¶ 123. Notably, the circuit court remitted the punitive damages awards without ordering a new trial on the issue of damages, as expressly directed in Wis. Stat. § 805.15(6). Moreover, the parties never elected to accept judgment in the remitted amount. *See* § 805.15(6). To the contrary, the parties cross-appealed the circuit court's order reducing their respective punitive damages awards.

¶ 124. The court of appeals reversed the circuit court's order reducing Jay's punitive damages award and affirmed the circuit court's order reducing Link Snacks and L.S.I.'s punitive damages awards. *N. Air Servs., Inc. v. Link,* No. 2008AP2897, unpublished slip op. (Wis. Ct. App. Nov. 17, 2009). The court of appeals

concluded that the circuit court lacked competency to reduce Jay's punitive damages award because Jack's motion after verdict was untimely. *Id.*, ¶ 4. Citing *Granado,* the court of appeals dismissed Jack's argument that his motion should be considered timely if Jay's motion, also filed late, was considered timely:

> Jay's motion . . . was filed on the twentieth day just minutes after the clerk's office closed, after counsel had called the office while it was open to inform the clerk the motion was on its way. The clerk placed a memo in the file stating the clerk exercised discretion to accept the motion for filing. We recognized the clerk's discretion to do so in *Granado,* 228 Wis. 2d at 797, 800. Nothing about the acceptance of Jay's filing presents any inequality vis-à-vis Jack's tardy filing the following day.

*N. Air Servs., Inc.,* No. 2008AP2897, unpublished slip op., ¶ 11. Accordingly, the court of appeals ordered the circuit court to reinstate the full $5,000,000 punitive damages award to Jay. *Id.*, ¶ 1.

¶ 125. This case is before the supreme court today on Jack and Jay's cross-appeals, largely because the clerk of circuit court deemed timely one of the two late motions after verdict.

## II. ANALYSIS

¶ 126. The majority affirms the decision of the court of appeals that reversed the circuit court's order reducing Jay's punitive damages award. Majority op., ¶¶ 11, 74. I agree with that result. As the court of appeals correctly recognized, the circuit court lacked competency to consider Jack's motion after verdict because the motion was not timely filed; the motion was filed on July 30, 2008, one day after the 20–day deadline

set forth in Wis. Stat. § 805.16(1). *See Ahrens-Cadillac Oldsmobile, Inc. v. Belongia,* 151 Wis. 2d 763, 766–67, 445 N.W.2d 744 (Ct. App. 1989) ("[T]he trial court loses its competency to consider postverdict motions filed after the twenty day deadline, unless the court has granted an extension within that time.").

¶ 127. At the same time, the majority declines to adopt a bright-line rule that if any documents or papers are delivered or received in the office of the clerk of circuit court after the specified closing time, they will be treated as having been filed on the following day. *See St. John's Home,* 150 Wis. 2d at 44. Under that bright-line rule, both Jack's motion after verdict and Jay's motion after verdict would be deemed filed on July 30, 2008, and hence would be untimely. Instead of adopting that bright-line rule, the majority adopts the court of appeals' rationale in *Granado,* concluding that "it is within the clerk of circuit court's discretion as an elected constitutional officer to accept and file pleadings received after the end of usual business hours, so long as that discretion is exercised reasonably and is within the guidelines provided by the legislature." Majority op., ¶ 73. The majority reasons that "[t]he instant case is a prime example of why this flexible approach is preferable to Jack's proposed bright-line rule." *Id.,* ¶ 72. I respectfully disagree. In fact, I believe this case underscores the disparate treatment that can result under the court of appeals' rationale in *Granado.* I would overrule *Granado* and, in the future, apply the bright-line rule articulated in *St. John's Home* to the clerks of circuit court.

¶ 128. To more fully explain my position, I begin by discussing why I believe *Granado* is not grounded in the law. I then turn to the instant case and discuss why

56

it underscores the disparate treatment that can result under the rationale in *Granado,* now adopted by the majority.

A. *Granado* is not grounded in the law.

¶ 129. This court has made clear that the acts of the clerk of circuit court are "ministerial and clerical," and the clerk "may not exercise judicial power except in accordance with the strict language of a statute conferring such power upon him." *Pac. Nat'l Fire Ins. Co. v. Irmiger,* 254 Wis. 207, 212, 36 N.W.2d 89 (1949); *see also State v. Prihoda,* 2000 WI 123, ¶ 22, 239 Wis. 2d 244, 618 N.W.2d 857; *Hamilton v. DILHR,* 56 Wis. 2d 673, 682, 203 N.W.2d 7 (1973); *State v. Dickson,* 53 Wis. 2d 532, 540–41, 193 N.W.2d 17 (1972); *State v. Johnston,* 133 Wis. 2d 261, 265, 394 N.W.2d 915 (Ct. App. 1986). Ministerial acts are, by definition, non-discretionary. *See State ex rel. J. H. Findorff & Son, Inc. v. Circuit Court for Milwaukee Cnty.,* 2000 WI 30, ¶ 20, 233 Wis. 2d 428, 608 N.W.2d 679; *Johnston,* 133 Wis. 2d at 267; *Black's Law Dictionary* 1011 (7th ed. 1999).

¶ 130. Nevertheless, in *Granado,* the court of appeals determined that the clerk of circuit court is entitled to some discretion in the discharge of its duties, including the requirement under Wis. Stat. § 59.40(2)(a)[5] that a paper be "properly deposited" before a clerk may file it.[6] 228 Wis. 2d at 804–05. For

[5] Wisconsin Stat. § 59.40(2) provides, in relevant part, that "[t]he clerk of circuit court shall: (a) File and keep all papers properly deposited with him or her in every action or proceeding unless required to transmit the papers. . . . "

[6] Notably, the court of appeals' decision in *Granado* makes no mention of the word "ministerial." *See* 228 Wis. 2d 794. The majority too dismisses the concept, acknowledging only in a

purposes of reviewing the clerk's exercise of its discretion under § 59.40(2)(a), the court of appeals concluded that "the further removed from an office's legislative guidelines and usual business hours a transaction occurs, the less likely it is that the papers have been properly deposited." *Id.*

¶ 131. The *Granado* court recognized that the authority of the clerk of circuit court is conferred and limited by the legislature, *id.* at 800, but nevertheless expanded the clerk's authority under Wis. Stat. § 59.40(2)(a) to include the discretion to accept papers after-hours *and* make a judicially-binding determination whether such papers are "properly deposited."[7] In doing so, the *Granado* court ignored the distinction between a clerk's discretionary authority to stay after-hours and physically accept delivery of papers and the judicial power to determine whether such papers were timely filed. Indeed, under the rationale in *Granado,* a clerk's discretionary determination that a paper delivered after-hours is or is not "properly deposited" has the effect of conferring or depriving a circuit court's competence under Wis. Stat. § 805.16(1) to consider a motion after verdict. *See Ahrens-Cadillac Oldsmobile,* 151 Wis. 2d at 766. Absent express statutory authority, a clerk may not exercise such judicial power. *Irmiger,* 254 Wis. at 212.

¶ 132. For these very reasons, in *St. John's Home,* this court recognized that "the timeliness of the filing of

footnote that the acts of the clerk of circuit court are ministerial and clerical. Majority op., ¶ 73 n.31.

[7] Likewise, the majority acknowledges that the discretion of the clerk of circuit court must be "legislatively-prescribed," majority op., ¶ 70 n.29, but then inappropriately expands the discretion to accept filings after-hours into the authority to determine whether such filings are timely. *See id.,* ¶ 71.

a petition for review should not be governed by happen-stance." 150 Wis. 2d at 43. We noted that the clerk of the supreme court has been designated to receive petitions for review and that "the timely filing of a petition for review is necessary to invoke this court's appellate jurisdiction." *Id.* at 42. Concerned about unpredictabil-ity and the potential for abuse, we "reject[ed]—as too problematic and cumbersome—any rule which would condone the after-hours delivery and receipt of a peti-tion for review." *Id.* at 43–44. Instead, we adopted a bright-line rule that if any documents or papers are delivered or received in the office of the clerk of the supreme court after the specified closing time of 5:00 p.m., they will be treated as having been filed on the following day. *Id.* at 44.

¶ 133. In the future, I would apply this same bright-line rule to the clerks of circuit court. While a clerk of circuit court has the discretionary authority to accept papers after-hours, such papers should be treated as having been filed on the following business day.

B. This case underscores the disparate treatment that can result under the rationale in *Granado,* now adopted by the majority.

¶ 134. To appreciate the potential for unpredict-ability and abuse under the rationale in *Granado,* one need not look any further than the instant case and the result advanced by the majority opinion.

¶ 135. A jury found that Jack acted maliciously toward Jay and that Jay acted maliciously toward Link Snacks and L.S.I. They calculated punitive damages accordingly and effectively created a wash, awarding

Jay $5,000,000 and at the same time assessing $5,000,000 against Jay. It must be remembered that "[i]n punitive damages, as in damages for pain and suffering, the law furnishes no mechanical legal rule for their measurement. The amount rests initially in the discretion of the jury." *Fahrenberg v. Tengel,* 96 Wis. 2d 211, 236, 291 N.W.2d 516 (1980).

¶ 136. Jack and Jay filed cross motions after the verdict, both of which were delivered to the Washburn County Clerk of Circuit Court after the office officially closed on July 29, 2008, the 20th day after the jury rendered its verdict in this case. Still, in an act of discretion upheld by the majority, the clerk found that Jay's motion was timely filed. As a result, the clerk effectively conferred competence upon the circuit court to consider Jay's otherwise late motion. The effect was considerable. The circuit court agreed with Jay that the $5,000,000 assessed against him was grossly excessive and consequently reduced Link Snacks and L.S.I.'s punitive damages awards to $1, creating a one to one ratio between their compensatory damages and punitive damages. While this court has recognized that "a reasonable relationship" between the amount of compensatory damages and the amount of punitive damages is required, we have also specifically "reject[ed] the notion that courts can use a multiplier, or fixed ratio of compensatory-to-punitive damages or criminal fines-to-punitive damages, to calculate the amount of reasonable punitive damages." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 194, 557 N.W.2d 67 (1996).

¶ 137. Because Jack's motion after verdict was not timely filed, the circuit court lacked competence to consider it, and Jay's punitive damages award remains at $5,000,000. Consequently, as far as Jay is concerned,

what was once a wash calculated by the jury is now a $4,999,998 award in his favor. That near $5,000,000 difference is the result of the clerk of circuit court's discretionary determination that Jay's motion after verdict was timely filed.

¶ 138. What is more, the circuit court remitted Link Snacks and L.S.I.'s punitive damages awards without providing the parties the option of a new trial on the issue of damages, as statutorily mandated. *See* Wis. Stat. § 805.15(6); *Mgmt. Computer Servs.,* 206 Wis. 2d at 175 & n.14.

¶ 139. The disparate treatment between Jack and Jay is potentially compounded if only Jay gets a new trial on the issue of damages. The majority remands this case to the court of appeals for a determination of whether the circuit court erred by precluding Jay from introducing to the jury his theory of damages for breach of fiduciary duty. *See* majority op., ¶¶ 99, 103. If the court of appeals answers that question in the affirmative, it seems that this case must at least be remanded to the circuit court for a new trial on the issue of Jay's damages for Jack's breach of fiduciary duties.[8]

¶ 140. As a practical matter, on remand, regardless of how the court of appeals decides the evidentiary issue of whether the circuit court erred by precluding

---

[8] What remains unclear is whether all parties herein would receive a new trial on the issue of damages such that the jury would hear the entire body of evidence, or whether it is contemplated that only Jay is to receive a new trial on damages for Jack's breach of fiduciary duties. In other words, while Link Snacks and L.S.I. had their punitive damages awards reduced to $1 without the benefit of a new trial on damages pursuant to Wis. Stat. § 805.15(6), may Jay now obtain a new trial on damages and potentially receive an even more lucrative jury verdict—without the jury being able to hear the whole story?

Jay from introducing to the jury his theory of damages for breach of fiduciary duty, this case could very well be sent back to the circuit court for a new trial on the issue of damages because of the circuit court's failure to abide by the statutory requirements in Wis. Stat. § 805.15(6). The circuit court remitted the punitive damages awards without providing the parties the option of a new trial on the issue of damages, as statutorily mandated in § 805.15(6). Pursuant to § 805.15(6), when the circuit court determines that a verdict is excessive, "the court shall determine the amount which as a matter of law is reasonable, and *shall* order a new trial on the issue of damages, *unless* within 10 days the party to whom the option is offered elects to accept judgment in the changed amount." (Emphasis added.) In this case, neither Jay, Link Snacks, nor L.S.I. accepted judgment in the changed amount. It follows that the court of appeals may need to address whether a new trial on the issue of damages is the proper remedy in this case and for whom.[9]

¶ 141. In summary, this disparate treatment is the upshot of the clerk of circuit court's discretionary determination, upheld by the majority, that Jay's motion after verdict was timely filed. In contrast, under a bright-line rule that any papers received in the office of the clerk of circuit court after the specified closing time will be treated as having been filed on the following day, both Jack's motion after verdict and Jay's motion after verdict would have been deemed untimely. In that case, the circuit court would have lacked competency to

---

[9] The court of appeals may need to address whether the circuit court nonetheless had the authority to adjust all parties' punitive damages awards, even though the circuit court was deciding only Jay's motion after verdict brought under Wis. Stat. § 805.15(6).

consider both motions, and the jury verdict would have stood. I favor that equitable result over the result advanced by the majority today.

¶ 142. For the foregoing reasons, I respectfully concur.

¶ 143. I am authorized to state that Justice N. PATRICK CROOKS joins this concurrence.